Matthew L. Sharp, Esq.
Nevada State Bar #4746
MATTHEW L. SHARP, LTD.
432 Ridge St.
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

*Attorneys for Plaintiff*

***Additional Counsel Listed Below***

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| VANESSA HENDERSON, Derivatively on Behalf of RED CAT HOLDINGS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>JEFFREY THOMPSON, LEAH LUNGER, JOSEPH HERNON, GEORGE MATUS, GEOFFREY HITCHCOCK, BRENDAN STWEART, JOSEPH FREEDMAN, NICHOLAS LIUZZA, JR., CHRISTOPHER R. MOE, and PAUL E. FUNK,<br><br>Defendants,<br><br>and,<br><br>RED CAT HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Vanessa Henderson ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Red Cat Holdings, Inc. ("Red Cat" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

///

including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. Nominal Red Cat is a Nevada corporation with its principal executive offices at 15 Ave. Munoz Rivera, Ste 2200, San Juan, PR 00901. Red Cat's shares trade on The NASDAQ Stock Market, LLC ("NASDAQ") under the ticker symbol "RCAT."

### Director Defendants

8. ***Defendant Jeffrey Thompson*** ("Thompson") has served as the Company's Chief Executive Officer ("CEO") and President since May 15, 2019, and as a Company director since 2019.

9. ***Defendant Joseph Freedman*** ("Freedman") has served as a Company director since January 2021. He also serves as the Lead Independent Director, Chairman of the Board, and as a member of the Nominating and Governance Committee and Audit Committee.

10. ***Defendant Nicholas Liuzza Jr.*** ("Liuzza") has served as a Company director since June 2019. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee.

11. ***Defendant Christopher Moe*** ("Moe") has served as a Company director since February 2022. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Governance Committee. The Board determined that Defendant Moe is qualified as an Audit Committee Financial Expert pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

12. ***Defendant Paul E. Funk*** ("Funk") has served as a Company director at all relevant times. He also serves as a member of the Audit Committee.

13. Defendants Thompson, Freedman, Funk, Liuzza, and Moe are collectively referred to herein as the "Director Defendants".

**Officer Defendants**

14. ***Defendant Leah Lunger*** ("Lunger") served as the Company's Chief Financial Officer ("CFO") from June 2024 to January 2025. She also previously served as the Company's Interim CFO from March 2024 to June 2024.

15. ***Defendant Joseph Hernon*** ("Hernon") served as the Company's CFO from January 2010 to March 2024.

16. ***Defendant George Matus*** ("Matus") served as the Company's CTO from November 2023 until December 2024. Defendant Matus is also the founder of Teal and served as its CEO until December 2024.

17. ***Defendant Geoffrey Hitchcock*** ("Hitchcock") has served as the Company's CRO since November 2024. Before this, Defendant Hitchcock served as the Company's Senior Vice President of Global Defense Solutions from September 2021 to December 2024. He also served as Teal's General Manager from March 2024 to November 2024.

18. ***Defendant Brendan Steward*** ("Stewart") has served as the Company's Vice President of Regulatory Affairs since October 2021. He recently began his role as Senior Vice President of Regulatory and Government Affairs in June 2025.

19. Defendants Lunger, Hernon, Matus, Hitchcock, and Stewart, together with Defendant Thompson, are collectively referred to herein as the "Officer Defendants."

20. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

21. Red Cat, together with its subsidiaries, provides various products, services, and solutions to the U.S. drone industry.

22. On August 31, 2021, Red Cat acquired Teal Drones, Inc. ("Teal"), manufacturer of the Golden Eagle drone, which, at the time, was one of only five drones approved by the U.S. Department of Defense ("DoD") for reconnaissance, public safety, and inspection applications.

Following Red Cat's acquisition of Teal, it also developed and launched, *inter alia*, the "Teal 2" drone, a small, unmanned aircraft system ("sUAS") designed to purportedly "Dominate the Night" during nighttime military operations.

23. Teal manufactures the Company's drones at the Salt Lake City Facility. On March 14, 2022, Red Cat announced that Teal had been selected by the DoD's Defense Innovation Unit and the U.S. Army to compete in Tranche 2 of the U.S. Army's Short Range Reconnaissance Program of Record (the "SRR Program"). The SRR Program is a U.S. Army initiative to provide a small, rucksack-portable sUAS to U.S. Army platoons.

24. At all relevant times, it was suggested or otherwise asserted that the SRR Program's Tranche 2 contract (the "SRR Contract") was worth potentially hundreds of millions to over a billion dollars in contract revenues.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

25. On March 17, 2022, after market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2022. During the call, Defendant Hernon stated:

> During the quarter, we doubled the size of the Teal facilities, both to increase its manufacturing output capabilities as well as to house its workforce . . . . [W]e have been making a lot of capital investments in Teal both in its facilities and its people to take advantage of what we see as significant commercial opportunities for the Golden Eagle.

26. During the same call, Defendant Thompson stated, in relevant part:

> [W]e are poised to grow like crazy. The plant is ready to go . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out thousands of drones a month . . . . [T]hat's our focus, and everyone is doing a great job on it.

27. On July 27, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for its fiscal year 2022 ("FY22"). During the call, Defendant Thompson stated, in relevant part, that "[t]he Teal Drone production line is in full swing[,]" that "[w]e expect to go into mass production in the fall," and that the SRR Program's "Tranche 2 . . . is for tens of thousands of drones and hundreds of millions of dollars' worth of revenue[.]"

28. Also on July 27, 2022, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY22 (the "2022 10-K"). The 2022 10-K stated, in relevant part, that Teal had "doubled the size of [the Salt Lake City Facility] in order to fully scale production capacity to meet the forecasted growth in demand[.]"

29. Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Thompson and Hernon certified, in relevant part, that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

30. On September 12, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the first quarter of its fiscal year 2023. During the call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated:

> We are currently switching from . . . production validation tests to ramp in mass production . . . . If we win Tranche 2, we will be capable of basically hitting the ground running and produced [sic] this drone as quickly as possible . . . . [N]ow we basically fix any issues and problems and vendors and tooling that we want to do to automate production line so that we can really scale it . . . . We hope to have the construction done in the next month or two and put this behind us and that will also bring us into full mass production.

31. On November 29, 2022, Red Cat hosted a conference call with investors and analysts to provide a business update, during which you stated:

> We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on . . . . So the factory is going to be basically in full swing. It's starting now and we'll be able to produce thousands of drones per month . . . . We have the inventory, we have the parts, we have the capital . . . . So the factory is doing awesome.

32. On December 15, 2022, Red Cat issued a press release announcing its financial and operating results for the second quarter of its fiscal year 2023 ("2Q23"). The press release stated, in relevant part, that "[e]xpansion of [the] manufacturing facility at Teal [is] expected to be completed in [the] fourth quarter of fiscal 2023 and will double production capacity[.]"

33. The same press release also quoted Defendant Thompson, who represented, in relevant part, that "the production line from our new U.S. factory in Salt Lake City . . . has the

capacity to build thousands of drones" and "that the U.S. Army's [SRR] program continues to expand in scope and value."

34. Also on December 15, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 2Q23. During the call, Defendant Thompson represented that the "new factory in Salt Lake City that can produce tens of thousands of drones per year."

35. On March 7, 2023, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2023. During the call, Defendant Thompson represented, in relevant part, that "[t]he Salt Lake City factory is complete and ready to go" and "[w]e now have the capacity to produce thousands of drones per month."

36. The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

37. On July 27, 2023, during after-market hours, Red Cat hosted a conference call (the "FY23 Conference Call") with investors and analysts to discuss its financial and operating results for its fiscal year 2023 ("FY23"). During the FY23 Conference Call, it was revealed that the Salt Lake City Facility could only currently produce 100 drones per month and was still being built, refined, and expanded. Specifically, Defendant Hernon disclosed that Teal's operations personnel were still "focused on building, refining and expanding our production capacity, which is presently at 100 systems per month," and that the Individual Defendants "believe [they] can more than triple [this capacity] over the next few years."

38. During the FY23 Conference Call's question-and-answer phase, an investor noted that "[y]ou said production is 100 per month" but "I think in the past you'd reference maybe 1,000 per month[,]" and asked "[i]s the 100 per month going to increase or is that pretty much where we're at for the rest of the year?" In response, Defendant Thompson stated:

///

> [F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem at ease right now. And that number is already growing slightly. But you don't go off and build 1,000 drones, because there's different frequencies . . . . And so you can't just make . . . batches and hope for the best of 1,000 and then ship them out.

39. In response to the same question, Defendant Hernon stated "I don't personally recall us ever saying we could produce 1,000 a month."

40. Also on July 27, 2023, during after-market hours, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY23 (the "2023 10-K"). The 2023 10-K reported, *inter alia*, that construction of the Salt Lake City Facility was only "substantially completed[,]" reiterated that its "production capacity was approximately [only] 100 drones per month[,]" and advised that "maximum production capacity for this facility can reach 1,000 drones per month over the next 2 to 3 years, provided that additional capital investments are made and manufacturing efficiencies realized."

41. Following Red Cat's FY23 Conference Call and its filing of the 2023 10-K, the Company's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices because of the continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, the progress in developing the same, and the overall value of the SRR Contract.

42. For example, during the FY23 Conference Call, Defendant Thompson indicated that the value of the SRR Contract could potentially exceed a billion dollars. Specifically, he noted that, although "[w]e still do not know the size of the award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" is that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and "Tranche 2 and 3 is for approximately 12,000 drones[.]"

43. On September 8, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Thompson, Freedman, Liuzza, and Moe solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

44. Defendants Thompson, Freedman, Liuzza, and Moe caused the 2023 Proxy Statement to be false and misleading by failing to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

45. The omitted information was material to investors, who were being asked to, *inter alia*, re-elect Defendants Thompson, Freedman, Liuzza, and Moe to the Board and approve an amendment to the Company's 2019 Equity Incentive Stock Plan, because the omitted information went to the core of the Company's operations and prospects. Thus, had the 2024 Proxy Statement contained these omissions, the Company's shareholders likely would have voted against the proposals solicited by Defendants Thompson, Freedman, Liuzza, and Moe.

46. However, upon the false and misleading proxy statement, Company shareholders voted to, *inter alia*: (i) reelect Defendants Thompson, Freedman, Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) ratify the appointment of BF Borgers as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2024; and (iii) approve the Amendment to increase the number of shares available for issuance under the 2019 Plan by 3,000,000.

47. Similarly, on March 18, 2024, during a conference call that Red Cat hosted with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2024, Defendant Thompson stated, in relevant part, that "[t]he [SRR] contract is for approximately 12,000 drones. The award for the first tranche of production drones two years ago, was $100 million for 1,083 drones."

48. During the same call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated:

> Production facility in Salt Lake City is in full mass production mode . . . . We are now demonstrating that we can build tens of thousands of drones yearly.

49. On August 8, 2024, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal year 2024 (the "2024 10-K").

The 2024 10-K stated, in relevant part, that "[d]uring Fiscal 2024, Teal continued to scale the [Salt Lake City Facility], including dedicated teams for production and assembly, manufacturing engineering, supply chain and logistics, warranty and returns, as well as a flight operations team that is focused on manufacturing and quality assurance and quality control."

50. Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced above, signed by Defendants Thompson and Lunger.

51. The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

52. On August 28, 2024, the Company filed its 2024 Proxy Statement with the SEC. Defendants Thompson, Freedman, Liuzza, Moe, and Funk solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act.

53. Defendants Thompson, Freedman, Liuzza, Moe, and Funk caused the 2024 Proxy Statement to be false and misleading by failing to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

54. The omitted information was material to investors, who were being asked to, *inter alia*, re-elect Defendants Thompson, Freedman, Liuzza, Moe, and elect Defendant Funk to the Board and approve the Company's 2024 Incentive Plan, because the omitted information went to the core of the Company's operations and prospects. Thus, had the 2024 Proxy Statement contained these omissions, the Company's shareholders likely would have voted against the proposals solicited by Defendants Thompson, Freedman, Liuzza, Moe, and Funk.

55. However, upon the false and misleading proxy statement, Company shareholders voted to, *inter alia*: (i) re-elect Defendants Thompson, Freedman, Liuzza, Moe and Funk to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (ii) ratify the appointment of dbbmckennon as the Company's independent registered public accounting firm

for the fiscal year ended April 30, 2025; and (iii) approve the 2024 Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. As a result of the shareholders approving the 2024 Incentive Plan, an additional 11,250,000 shares were made initially available for disbursement.

56. On September 23, 2024, during after-market hours, Red Cat issued a press release (the "1Q25 Press Release") announcing its financial and operating results for the first quarter of its fiscal year 2025 ("1Q25"). Among other results, the Company reported losses per share of $0.17, missing consensus estimates by $0.09, and revenue of $2.8 million, missing consensus estimates by $1.07 million.

57. The same day, also during after-market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 1Q25 (the "1Q25 Conference Call"). During the 1Q25 Conference Call, Defendant Thompson disclosed that, contrary to his prior representations that the Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," Red Cat had spent "the past four months . . . retooling and preparing for high volume production." Likewise, in addressing the Company's sales results for the quarter, Defendant Thompson admitted that a "pause in manufacturing of Teal 2 and building our Army prototypes impacted Teal 2 sales" because, inter alia, Red Cat "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

58. Following Red Cat's issuance of the 1Q25 Press Release and Defendant Thompson's disclosures during the 1Q25 Conference Call, the Company's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices because of the continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, Defendants' progress in developing the same, and the overall value of the SRR Contract.

59. For example, on November 19, 2024, Red Cat issued a press release announcing that it had won the SRR Contract "to meet the Army's currently stated acquisition objective for 5,880 systems, which is subject to change over the 5 year period of performance." The same day, Red Cat

hosted a conference call with investors and analysts (the "November 2024 Conference Call"), during which Defendant Matus indicated, *inter alia*, that total revenue under the SRR Contract could exceed $260 million, stating:

> [T]he average price per system . . . includes [sic] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems . . . . [Y]ou can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves. I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. In my opinion, the United States Army is going to need a lot more drones.

60. Also during the November 2024 Conference Call, Defendants Stewart and Thompson expressed their confidence that Red Cat could realize up to $50 million to $79.5 million in revenue from the SRR Contract during the Company's fiscal year 2025 alone:

> **[Defendant Stewart]**: Right now, in the National Defense Authorization Act, we're sitting at a [sic] approximate program line value . . . that supports SRR of $79.5 million. Now that is a – that number is not final. The NDAA is still not passed and won't be for about 60 days. But we feel very confident that through this support, we'll be able to expand this program going into the future.
>
> * * *
>
> **[Defendant Thompson]**: [W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that $79 million that could possibly put the calendar year on $120 million for next year. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Stewart] talked about is up to $79 million for the – for 2025 . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. So, it could be up to $79 million. Once we have more clarity, we think it's easily going to be in the close to $50 million anyway for 2025 calendar. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think it'll be approximately $50 million from SRR and other things that will add to that as other branches of the Army piles on there.

61. During the same call, Defendants Thompson and Hitchcock suggested that Red Cat could earn an additional 30% to 70% of revenue from the SRR Contract based on supplemental services:

> **[Defendant Thompson]**: [H]ow these programs of records [like the SRR Program] work [is] that they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs."
>
> * * *

> **[Defendant Hitchcock]**: [T]ypically, year-over-year, you could expect somewhere in the range of 30% added for spares, repairs and training year-over-year."

62. The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the public statements were materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

63. On January 16, 2025, during intraday trading hours, Kerrisdale published a report alleging, inter alia, that Red Cat had overstated the value of the SRR Contract and lacks the production capacity to deliver on its promises. For example, the Kerrisdale Report stated:

> **The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated.** Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win would be in the billion dollar range over the course of 5-10 years. Upon winning the contract, management curbed those expectations by quite a bit, though *still* signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue, specifically citing the National Defense Authorization Act (NDAA) text. But the NDAA says nothing about the SRR funding in particular and the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million, which is a very far cry from Red Cat's 2025 SRR guidance. Additionally, the cost for repairs, replacements, and related services are *included* in that $20-25 million, so Red Cat's "plus 30%" should be entirely discounted.

(Emphasis in original.)

64. The Kerrisdale Report also noted that Red Cat had compromised the overall value of the SRR Contract by announcing its award of the contract without the U.S. Army's permission, stating:

> We also discovered in the course of our diligence that Red Cat's November announcement of the SRR contract win was made improperly without the Army's approval. While that's unlikely to scuttle the contract win completely, our sources indicated that it might make negotiating the precise contract terms with the Army contentious and more difficult for Red Cat. It may also result in the Army more strictly enforcing contract terms and more willing to contemplate other suppliers if and when the opportunity presents itself.

65. Further, the Kerrisdale Report raised concerns about the timing of executive departures and insider transactions that took place shortly after the announcement of the SRR contract, stating:

> **Teal's wunderkind founder and brains behind the SRR, [Defendant] Matus, resigned just a week after the SRR announcement, with [Defendant] Lunger resigning just 3 weeks later.**
>
> * * *
>
> Six days after Red Cat announced the SRR award, [Defendant] Matus gave 30 days' notice of his resignation. Between December 20th and December 27th, he sold about 800,000 shares at an average price of $11.75. Just a few days after his resignation, [Defendant] Matus announced he was co-founding a new company dedicated to addressing weaknesses in the defense procurement ecosystem, which suggests that his resignation was a long time in coming. That seems to us like a harsh repudiation of Red Cat and its management team, and a vote of no confidence in the ability of the company to achieve what management says it will.
>
> [Defendant] Matus wasn't the only one at Red Cat lacking conviction. [Defendant] Lunger announced on the mid-December earnings call that she was resigning for family reasons and sold half a million shares – about 60% of her holdings – for $9.52 on December 20th. Other directors and insiders – including [Defendant] Thompson! – have sold a total of 1.6 million shares for over $16 million just since December 20th.

(Emphasis in original.)

66. The Kerrisdale Report also alleged that Red Cat has continued to mislead investors about the Salt Lake City Facility's production capacity, stating:

> Over the last 3 years, Red Cat has promised investors *multiple times* that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . ***[D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones.*** Getting there would take time and a real capital expenditure commitment.
>
> * * *
>
> In the course of our due diligence, ***we found a drone industry specialist who's been following Teal since its founding by [Defendant] Matus*** and who had the utmost admiration for what he's accomplished. ***They were adamant that there's just no way that Teal is capable of any sort of mass production*** . . . . Red Cat's financials seem to confirm this assessment: ***Over the 3 years ending on October 31, the company has spent a mere $3.1 million on capital expenditures, with over two thirds of that before the end of 2022. It's highly implausible that a mass-***

***production facility for manufacturing drones has been built at any point in the last two years for less than $1 million.***

67. Following publication of the Kerrisdale Report, Red Cat's stock price fell $2.35 per share, or 21.54%, over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

**INSIDER TRADING**

68. The Individual Defendants were further motivated to engage in the wrongful course of conduct in order to enable Company insiders to collectively sell millions of dollars' worth of their personally held Red Cat common stock while in possession of the material, non-public information described herein.

69. Specifically, Defendant Thompson enriched himself by over $5.7 million by selling 500,000 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above. These proceeds are also undoubtedly material to Defendant Thompson, thus demonstrating his motive and intent, because it is more than 18.5x the income that Defendant Thompson received as the Company's CEO in the "Transition Period,"[1] and more than 3x the income he received in the "Fiscal YE April 30, 2024."[2]

70. Defendant Lunger enriched herself by approximately $5 million by selling 524,798 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above. Defendant Lunger's sales constituted approximately 98.6% of her total share ownership.[3] These proceeds are also undoubtedly material to Defendant Lunger, thus demonstrating her motive and intent, because it is more than 5x the income that Defendant Lunger received as the Company's CFO in the "Transition Period," and more than 24x the income she received in the "Fiscal YE April 30, 2024."

///

---

[1] The "Transition Period," as reported in the Company's 2025 proxy statement refers to the eight-month period ended December 31, 2024.

[2] "Fiscal YE April 30, 2024," as reported in the Company's 2025 proxy statement refers to the full year ended April 30, 2024.

[3] The Company's 2024 proxy statement notes that, as of August 26, 2024, Defendant Lunger possessed 532,241 shares of Red Cat common stock. The Company's 2025 proxy statement notes that Defendant Lunger now owns just 6,406 shares as of April 21, 2025.

71. Defendant Matus enriched himself by approximately $9.2 million by selling 781,383 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above. Defendant Matus' sales constituted a majority of his total share ownership as his Form 4 filed before his selling spree reported share ownership of 1,085,789 Red Cat common stock. These proceeds are also undoubtedly material to Defendant Matus, thus demonstrating his motive and intent, because it is more than 7.5x the income that Defendant Matus received as the Company's CTO in the "Transition Period," and more than 46x the income he received in the "Fiscal YE April 30, 2024."

72. Defendant Hitchcock enriched himself by approximately $1.2 million by selling 113,823 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above.

73. Defendant Freedman enriched himself by approximately $500,000 by selling 50,000 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above.

74. Defendant Liuzza enriched himself by approximately $3.5 million by selling 300,000 shares of Red Cat common stock while in possession of material, non-public information concerning the SRR Contract, as described above. These proceeds are undoubtedly material to Defendant Liuzza, thus demonstrating his motive and intent, because it is more than 14x the income that Defendant Liuzza received for his services as a director in 2024.

75. Collectively, Defendants Thompson, Lunger, Matus, Hitchcock, Freedman, and Liuzza (collectively, the "Insider Trading Defendants") used their possession of material non-public information concerning the SRR Contract and their positions of trust within the Company to take advantage of the Company's artificially inflated stock price, enabling them to collectively reap over $25.1 million in gross proceeds.

## DAMAGES TO THE COMPANY

### Securities Class Action

76. On June 13, 2025, a securities class action complaint was filed in the United States District Court for the District of New Jersey against the Company and the Officer Defendants. The

complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned *Olsen v. Red Cat Holdings, Inc, et al.*, Case No. 2:25-cv-05427 (D.N.J.) ("Securities Class Action").

77. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**<u>Unjust Compensation</u>**

78. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

79. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

80. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**<u>Insider Trading</u>**

81. As discussed above, while in possession of material, non-public information, the Insider Trading Defendants used their positions of trust and authority to take advantage of the Company's artificially inflated share price to obtain over $25.1 million gross proceeds.

///

///

**Additional Damages to the Company**

82. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

83. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

84. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

85. Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

86. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Red Cat, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

87. At all relevant times, the Company had in place its Code of Conduct which applies to "every full and part-time employee of the Company and its subsidiaries, all members of the Company's senior management, including the Company's [CEO] and [CFO], and every member of the Company's Board of Directors."

88. In a section entitled "General Requirements," the Code of Conduct states:

> To be honest, fair, and accountable in all business dealings and obligations, and to ensure:
>
> • the ethical handling of conflicts of interest between personal and professional relationships;

///

> • full, fair, accurate, timely and understandable disclosure in the reports required to be filed by the Company with the Securities and Exchange Commission and in other public communications made by the Company; and
>
> • compliance with applicable governmental laws, rules and regulations.

89. Under the section titled "Protection and Proper Use of Company Assets," in the subsection "Accurate Records and Reporting," the Code of Conduct states:

> Under law, the Company is required to keep books, records and accounts that accurately and fairly reflect all transactions, disposition of assets and other events that are the subject of specific regulatory record keeping requirements, including safety and inspection reports, routing and scheduling information, generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements. All Company financial reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Under no circumstance may there be any unrecorded liability or fund of the Company, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of the Company. No payment on behalf of the Company may be approved or made with the intention, understanding or awareness that any part of the payment is to be used for any purpose other than that described by the documentation supporting the payments. In addition, intentional accounting misclassifications (e.g., expense versus capital) and improper acceleration or deferrals of expenses or revenues are unacceptable reporting practices that are expressly prohibited.
>
> The Company has developed and maintains a system of internal controls to provide reasonable assurance that transactions are executed in accordance with management's authorization, are properly recorded and posted, and is in compliance with regulatory requirements. The system of internal controls within the Company includes written policies and procedures, budgetary controls, supervisory review and monitoring, and various other checks and balances, and safeguards such as password protection to access certain computer systems. Associates are expected to be familiar with, and to adhere strictly to, these control policies.
>
> The Company has also developed and maintains a set of disclosure controls and procedures to ensure that all of the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.
>
> Associates are expected to be familiar with, and to adhere strictly to, these internal controls and disclosure controls and procedures.
>
> Responsibility for compliance with these principles rests with all associates, and not solely with the Company's accounting personnel. All associates involved in approving transactions, supplying documentation for transactions, and determining account classifications are responsible for complying with these standards. Because the integrity of the Company's external reports to shareholders and the Securities

> and Exchange Commission depends on the integrity of the Company's internal reports and record-keeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting. The Company is committed to full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by it with the SEC, and it expects each associate to work diligently towards that goal. All associates shall, as requested, assist the Company's Disclosure Committee in gathering, analyzing and summarizing relevant information for such periodic reports.

90. In the same section, under a subsection entitled "Records Management," the Code of Conduct states:

> The Company requires honest and accurate recording and reporting of information in order to make reasonable business decisions. All Company business data, records and reports must be prepared truthfully and accurately. Numerous federal and state statutes require the proper retention of many categories of records and documents that are commonly maintained by companies. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and conform to the applicable legal requirements and the Company's system of internal controls for retention and destruction.

91. Under the section "Compliance with Laws, Rules and Regulations," in the subsection "Insider Trading Policy," the Code of Conduct states:

> The Company expressly forbids any associate from trading in the Company's stock, or the stock of others, based on material non-public information or communicating material non-public information to others in violation of the law. This conduct is frequently referred to as "insider trading." This policy applies to every associate of the Company and extends to activities both within and outside their duties to the Company, including trading for a personal account.
>
> The concept of who is an "insider" is broad. It includes officers, directors and employees of a Company. In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a Company's affairs and as a result is given access to information solely for the Company's purpose. A temporary insider can include, among others, a Company's investment advisors, agents, attorneys, accountants and lending institutions, as well as the employees of such organizations. The Company may become a temporary insider of another Company with which it has a contractual relationship, to which it has made a loan, to which it provides advice or for which it performs other services.
>
> Trading on inside information is not a basis for liability unless the information is material. This is information that a reasonable investor would consider important in making his or her investment decisions, or information that is likely to have a significant effect on the price of a Company's securities.
>
> Information is non-public until it has been effectively communicated to the marketplace. Tangible evidence of such dissemination is the best indication that the information is public. For example, information found in a report filed with the Securities and Exchange Commission or appearing in a national newspaper would be considered public.

> Each associate should be familiar with and abide by the Statement of Policy on Securities Trading. A copy of this policy is given to, and signed by, all new associates of the Company and is available from the Human Resources Department.

**<u>Audit Committee Charter</u>**

92. At all relevant times, the Company maintained an Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Charter states that the purpose of the Audit Committee is to:

> The Committee has been established to: (a) represent and assist the Board in its oversight responsibilities regarding the Company's accounting and financial reporting processes, the audits of the Company's financial statements, including the integrity of the financial statements, and the independent auditors' qualifications and independence; (b) oversee the preparation of the report required by Securities and Exchange Commission ("SEC") rules for inclusion in the Company's annual proxy statement; (c) retain and terminate the Company's independent auditors; (d) approve in advance all audit and permissible non-audit services to be performed by the independent auditors; (e) approve related person transactions; and (f) perform such other functions as the Board may from time to time assign to the Committee.

93. Under the section, "Committee Responsibilities," in the subsection entitled, "Review of Documents and Reports," the Audit Committee Charter states:

> 1. Review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements (including disclosures under the section entitled Management's Discussion and Analysis of Financial Condition and Results of Operations and any report by the independent auditors related to the financial statements. Based on the review, the
>
> 2. Committee shall make its recommendation to the Board as to the inclusion of the Company's audited consolidated financial statements in the Company's annual report on Form 10-K.
>
> 3. Review and discuss earnings press releases with management and the independent auditors.
>
> 4. Oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

94. Under the same section, in the subsection "Internal Controls and Disclosure Controls," the Audit Committee Charter states:

> 1. Review and discuss the adequacy and effectiveness of the Company's internal controls, including periodically receiving reports from the Company's independent auditors and Chief Executive Officer and Chief Financial Officer regarding the Company's system of internal controls.

///

> 2. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures, including periodically receiving reports from management regarding the Company's disclosure controls and procedures.
>
> 3. Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

95. Under the same section, in the subsection "Other Responsibilities," the Audit Committee Charter states:

> 1. Review and discuss the Company's practices with respect to risk assessment and risk management
>
> 2. Annually evaluate the adequacy of the Committee's charter.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

96. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

97. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

98. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

99. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and

truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

100. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

101. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

102. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

104. Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

105. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

106. Following the alleged misconduct and damage, on June 17, 2025, Plaintiff made a demand (the "Demand") on the Board of Directors to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to

///

recover, for the benefit of the Company, the damage caused to it. Attached hereto as **Exhibit A** is a true and correct copy of the Demand.

107. Following no response, Plaintiff, through her undersigned counsel, identified the Company's counsel in the Securities Class Action and contacted them directly on August 19, 2025 to see if they also represented the Company and/or the Board with respect to the Demand.

108. On September 9, 2025, Plaintiff received a response from the Company's counsel, informing Plaintiff that:

> [T]he Board believes that for the moment it is premature to undertake additional investigation and/or pursuit of claims as demanded in the Demand Letter. The Board expects to revisit this matter in ninety days to determine how to best address the issues raised in the Demand Letter, at which point I may revert to you with further information.

109. A true and correct copy of the Board's September 9, 2025 response is attached hereto as **Exhibit B**.

110. Notwithstanding the fact that the Board's response contained little justification to support the claim that "it is premature to undertake additional investigation and/or pursuit of the claims," Plaintiff determined to give the Board a reasonable opportunity to carry out its duties in response to the Demand and waited the ninety (90) days.

111. After waiting ninety (90) days and having heard nothing further from the Company or the Board, Plaintiff wrote to the Company's counsel on January 9, 2026, noting the lack of response or action and requested a substantive response to the Demand.

112. To date, Plaintiff has received no further response and has seen no further action being taken by the Board. Given the Board's duty to act upon a demand in good faith, its inaction here constitutes a willful and wrongful refusal of the Demand.

113. The Board has been on notice of the wrongdoing alleged herein since at least the commencement of the Securities Class Action, filed in June 2025, if not from the beginning of the wrongdoing alleged herein. As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk. However, to date, the Board has failed to take any action on behalf of the Company.

114. Because the Individual Defendants plausibly knew about the production capacity of the Salt Lake Facility while also touting unrealistic production goals, and also knew the truth regarding the value of the SRR Contract, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as it moves forward with defective internal controls and burdened with the financial harms caused to it.

115. In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.

116. Furthermore, the Board has ignored the Demand for more than seven (7) months as of the date of this Complaint. This lengthy delay in taking any action carries the risk that as time progresses, evidence becomes stale, memories dim, and the ability to adequately investigate and/or prove the allegations herein will become more burdensome, particularly given the risks of potential destruction of documents and electronic data (whether intentional or inadvertent), dissipation of the Company's assets, fading memories, and increased geographical dispersion of percipient witnesses. Thus, the Board's lengthy and continued inaction here does not serve the interests of the Company in being able to adequately investigate and/or bring the claims that belong to it.

117. Accordingly, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in Red Cat's favor and should be permitted to proceed with this derivative action.

///

///

///

## FIRST CAUSE OF ACTION

## (Against the Individual Defendants for Breach of Fiduciary Duties)

118. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

119. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

120. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

121. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

## (Against the Individual Defendants for Gross Mismanagement)

124. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

125. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

126. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

127. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

128. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

130. As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Individual Defendants' unlawful actions.

131. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

132. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

134. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

135. Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Insider Trading Defendants for Insider Trading)**

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137. By reason of their fiduciary role as officers and directors of the Company, the Insider Trading Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

138. As directors and/or officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

139. When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $25.1 million.

140. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

141. As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

**SIXTH CAUSE OF ACTION**

**(Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)**

142. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

143. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

144. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

145. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

146. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 and 2024 Proxy Statements (collectively, the "Proxy Statements") filed with the SEC.

147. The Proxy Statements were used to solicit shareholder votes in connection with the re-election of certain to the Board, among other things.

148. The Proxy Statements were materially false and misleading because they each concealed from investors that: (i) the Salt Lake City Facility's production capacity, and the progress

in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the public statements were materially false and misleading at all relevant times.

149. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

150. The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of, among other things, the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

151. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B. Awarding, against the Individual Defendants in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets;

C. Awarding, against the Insider Trading Defendants, disgorgement of all illicitly gained proceeds from their unlawful insider trading;

D. Awarding, against the Director Defendants in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Securities Exchange Act of 1934;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED this 26th day of January 2026.

MATTHEW L. SHARP, LTD.

/s/ Matthew L. Sharp

Matthew L. Sharp, Esq.
Nevada State Bar #4746
MATTHEW L. SHARP, LTD.
432 Ridge St.
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

Thomas J. McKenna, Esq.*
Gregory M. Egleston, Esq.*
GAINEY McKENNA & EGLESTON
260 Madison Ave., 22nd Floor
New York, NY 10016
(212) 983-1300
tjmckenna@gme-law.com
gegleston@gme-law.com
**Pro Hac Vice Application forthcoming*

***Attorneys for Plaintiff***

## VERIFICATION

I, VANESSA HENDERSON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Red Cat Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Red Cat Holdings, Inc. common stock at all relevant times.

Vanessa Henderson

VANESSA HENDERSON
1/19/2026

# EXHIBIT A

GAINEY McKENNA & EGLESTON

ATTORNEYS AT LAW

www.gme-law.com

260 MADISON AVENUE
22nd FLOOR
NEW YORK, NEW YORK 10016
TEL: (212) 983-1300
FAX: (212) 983-0383

375 ABBOTT ROAD
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-9002

Please Reply To The New York Address

June 17, 2025

**Via FedEx**

Mr. Jeffrey M. Thompson
Chairman of the Board, Chief Executive Officer, and President
Red Cat Holdings, Inc.
15 Ave. Munoz Rivera, Suite 2200
San Juan, PR 00901

Re: Shareholder Litigation Demand

Dear Mr. Thompson:

We represent Ms. Vanessa Henderson, a beneficial owner of Red Cat Holdings, Inc. ("Red Cat" or the "Company") common stock.

Ms. Henderson intends to retain her ownership interest through the conclusion of any further proceedings relating to the contents of this letter. This letter constitutes a formal demand on behalf of our client that the Board of Directors (the "Board") of Red Cat take action against certain current and/or former officers and directors of the Company, including Joseph Freedman, Gen. Paul Edward Funk II (Ret.), Nicholas Liuzza Jr., Christopher R. Moe, Leah Lunger, Joseph Hernon, George Matus, Geoffrey Hitchcock, Brendan Stewart, yourself, and other individuals (the "Officers and Directors") and entities that engaged in the wrongdoing as set forth below.

This litigation demand is related to, among other things, the false and/or misleading statements and/or failure to disclose that: (i) the Company's facility in Salt Lake City, Utah (the "Salt Lake Facility") had its production capacity, and progress in developing the same, overstated; (ii) the overall value of the SRR Contract (defined below) was overstated; and (iii) as a result, the Company's public

statements were materially false and misleading at all relevant times.

Ms. Henderson hereby demands that the Board take action against the above-named Officers and Directors for their breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, insider trading, aiding and abetting, and other unlawful conduct. The Board should also consider and implement corporate governance reforms designed to address and prevent the sort of wrongdoing described in this letter.

**BACKGROUND**

As you are aware, Red Cat, together with its subsidiaries, provides various products, services, and solutions to the U.S. drone industry.

On August 31, 2021, Red Cat acquired Teal Drones, Inc. ("Teal"), manufacturer of the Golden Eagle drone, which, at the time, was one of only five drones approved by the U.S. Department of Defense ("DoD") for reconnaissance, public safety, and inspection applications. Following Red Cat's acquisition of Teal, it also developed and launched, *inter alia*, the "Teal 2" drone, a small, unmanned aircraft system ("sUAS") designed to purportedly "Dominate the Night" during nighttime military operations.

Teal manufactures the Company's drones at the Salt Lake City Facility. On March 14, 2022, Red Cat announced that Teal had been selected by the DoD's Defense Innovation Unit and the U.S. Army to compete in Tranche 2 of the U.S. Army's Short Range Reconnaissance Program of Record (the "SRR Program"). The SRR Program is a U.S. Army initiative to provide a small, rucksack-portable sUAS to U.S. Army platoons.

At all relevant times, the Company suggested or otherwise asserted that the SRR Program's Tranche 2 contract (the "SRR Contract") was worth potentially hundreds of millions to over a billion dollars in contract revenues.

**FALSE AND MISLEADING STATEMENTS**

On March 17, 2022, after market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the third

quarter of its fiscal year 2022. During the call, Hernon stated, in relevant part:

> During the quarter, we doubled the size of the Teal facilities, both to increase its manufacturing output capabilities as well as to house its workforce . . . . [W]e have been making a lot of capital investments in Teal both in its facilities and its people to take advantage of what we see as significant commercial opportunities for the Golden Eagle.

During the same call, you stated, in relevant part:

> [W]e are poised to grow like crazy. The plant is ready to go . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out thousands of drones a month . . . . [T]hat's our focus, and everyone is doing a great job on it.

On July 27, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for its fiscal year 2022 ("FY22"). During the call, you stated, in relevant part, that "[t]he Teal Drone production line is in full swing[,]" that "[w]e expect to go into mass production in the fall," and that the SRR Program's "Tranche 2 . . . is for tens of thousands of drones and hundreds of millions of dollars' worth of revenue[.]"

Also on July 27, 2022, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY22 (the "2022 10-K"). The 2022 10-K stated, in relevant part, that Teal had "doubled the size of [the Salt Lake City Facility] in order to fully scale production capacity to meet the forecasted growth in demand[.]"

Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein you and Hernon certified, in relevant part, that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

On September 12, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the first quarter of its fiscal

year 2023. During the call, with respect to the Salt Lake City Facility's production capacity, you stated, *inter alia*:

> We are currently switching from . . . production validation tests to ramp in mass production . . . . If we win Tranche 2, we will be capable of basically hitting the ground running and produced [sic] this drone as quickly as possible . . . . [N]ow we basically fix any issues and problems and vendors and tooling that we want to do to automate production line so that we can really scale it . . . . We hope to have the construction done in the next month or two and put this behind us and that will also bring us into full mass production.

On November 29, 2022, Red Cat hosted a conference call with investors and analysts to provide a business update, during which you stated, in relevant part:

> We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on . . . . So the factory is going to be basically in full swing. It's starting now and we'll be able to produce thousands of drones per month . . . . We have the inventory, we have the parts, we have the capital . . . . So the factory is doing awesome.

On December 15, 2022, Red Cat issued a press release announcing its financial and operating results for the second quarter of its fiscal year 2023 ("2Q23"). The press release stated, in relevant part, that "[e]xpansion of [the] manufacturing facility at Teal [is] expected to be completed in [the] fourth quarter of fiscal 2023 and will double production capacity[.]"

The same press release also quoted you, who represented, in relevant part, that "the production line from our new U.S. factory in Salt Lake City . . . has the capacity to build thousands of drones" and "that the U.S. Army's [SRR] program continues to expand in scope and value."

Also on December 15, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 2Q23. During the call, you represented that the "new factory in Salt Lake City that can produce tens of thousands of drones per year."

On March 7, 2023, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2023. During the call, you represented, in relevant part, that "[t]he Salt Lake City factory is complete and ready to go" and "[w]e now have the capacity to produce thousands of drones per month."

The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

**<u>THE TRUTH BEGINS TO EMERGE</u>**

On July 27, 2023, during after-market hours, Red Cat hosted a conference call (the "FY23 Conference Call") with investors and analysts to discuss its financial and operating results for its fiscal year 2023 ("FY23"). During the FY23 Conference Call, it was revealed that the Salt Lake City Facility could only currently produce 100 drones per month and was still being built, refined, and expanded. Specifically, Hernon disclosed that Teal's operations personnel were still "focused on building, refining and expanding our production capacity, which is presently at 100 systems per month," and that the Officers and Directors "believe [they] can more than triple [this capacity] over the next few years."

During the FY23 Conference Call's question-and-answer phase, an investor noted that "[y]ou said production is 100 per month" but "I think in the past you'd reference maybe 1,000 per month[,]" and asked "[i]s the 100 per month going to increase or is that pretty much where we're at for the rest of the year?" In response, you stated, in relevant part:

> [F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem at ease right now. And that number is already growing slightly. But you don't go off and build 1,000 drones, because there's different frequencies . . . . And so you can't just make . . . batches and hope for

the best of 1,000 and then ship them out.

In response to the same question, Hernon stated "I don't personally recall us ever saying we could produce 1,000 a month."

Also on July 27, 2023, during after-market hours, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY23 (the "2023 10-K"). The 2023 10-K reported, *inter alia*, that construction of the Salt Lake City Facility was only "substantially completed[,]" reiterated that its "production capacity was approximately [only] 100 drones per month[,]" and advised that "maximum production capacity for this facility can reach 1,000 drones per month over the next 2 to 3 years, provided that additional capital investments are made and manufacturing efficiencies realized."

Following Red Cat's FY23 Conference Call and its filing of the 2023 10-K, the Company's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices because of the continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, the progress in developing the same, and the overall value of the SRR Contract.

For example, during the FY23 Conference Call, you indicated that the value of the SRR Contract could potentially exceed a billion dollars. Specifically, you noted that, although "[w]e still do not know the size of the award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" is that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and "Tranche 2 and 3 is for approximately 12,000 drones[.]"

Similarly, on March 18, 2024, during a conference call that Red Cat hosted with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2024, you stated, in relevant part, that "[t]he [SRR] contract is for approximately 12,000 drones. The award for the first tranche of production drones two years ago, was $100 million for 1,083 drones."

During the same call, with respect to the Salt Lake City Facility's production capacity, you stated, in relevant part:

> Production facility in Salt Lake City is in full mass production mode . . . . . We are now demonstrating that we can build tens of thousands of drones yearly.

On August 8, 2024, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal year 2024 (the "2024 10-K"). The 2024 10-K stated, in relevant part, that "[d]uring Fiscal 2024, Teal continued to scale the [Salt Lake City Facility], including dedicated teams for production and assembly, manufacturing engineering, supply chain and logistics, warranty and returns, as well as a flight operations team that is focused on manufacturing and quality assurance and quality control."

Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced above, signed by you and Lunger.

The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the foregoing public statements were materially false and misleading at all relevant times.

On September 23, 2024, during after-market hours, Red Cat issued a press release (the "1Q25 Press Release") announcing its financial and operating results for the first quarter of its fiscal year 2025 ("1Q25"). Among other results, the Company reported losses per share of $0.17, missing consensus estimates by $0.09, and revenue of $2.8 million, missing consensus estimates by $1.07 million.

The same day, also during after-market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 1Q25 (the "1Q25 Conference Call"). During the 1Q25 Conference Call, you disclosed that, contrary to his prior representations that the Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," Red Cat had spent "the past four months . . . retooling and preparing for high volume production." Likewise, in addressing the Company's sales results for the quarter, you admitted that a "pause in manufacturing of Teal 2 and building our Army prototypes impacted Teal 2 sales" because, *inter alia*, Red Cat "couldn't produce

and sell Teal 2 units[] while retooling [its] factory."

Following Red Cat's issuance of the 1Q25 Press Release and your disclosures during the 1Q25 Conference Call, the Company's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices because of the continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, the progress in developing the same, and the overall value of the SRR Contract.

For example, on November 19, 2024, Red Cat issued a press release announcing that it had won the SRR Contract "to meet the Army's currently stated acquisition objective for 5,880 systems, which is subject to change over the 5 year period of performance." The same day, Red Cat hosted a conference call with investors and analysts (the "November 2024 Conference Call"), during which Matus indicated, *inter alia*, that total revenue under the SRR Contract could exceed $260 million, stating:

> [T]he average price per system . . . includes [sic] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems . . . . [Y]ou can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves. I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. In my opinion, the United States Army is going to need a lot more drones.

Also during the November 2024 Conference Call, you and Stewart expressed their confidence that Red Cat could realize up to $50 million to $79.5 million in revenue from the SRR Contract during the Company's fiscal year 2025 alone:

> **Stewart**: Right now, in the National Defense Authorization Act, we're sitting at a [sic] approximate program line value . . . that supports SRR of $79.5 million. Now that is a – that number is not final. The NDAA

> is still not passed and won't be for about 60 days. But we feel very confident that through this support, we'll be able to expand this program going into the future.
>
> * * *
>
> **You**: [W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that $79 million that could possibly put the calendar year on $120 million for next year. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Stewart] talked about is up to $79 million for the – for 2025 . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. So, it could be up to $79 million. Once we have more clarity, we think it's easily going to be in the close to $50 million anyway for 2025 calendar. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think it'll be approximately $50 million from SRR and other things that will add to that as other branches of the Army piles on there.

During the same call, you and Hitchcock suggested that Red Cat could earn an additional 30% to 70% of revenue from the SRR Contract based on supplemental services:

> **You**: [H]ow these programs of records [like the SRR Program] work [is] that they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs."
>
> * * *
>
> **Hitchcock**: [T]ypically, year-over-year, you could expect somewhere in the range of 30% added for spares, repairs and training year-over-year."

The above-referenced statements were materially false and misleading and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and the

progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, the public statements were materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

On January 16, 2025, during intraday trading hours, Kerrisdale published a report alleging, *inter alia*, that Red Cat had overstated the value of the SRR Contract and lacks the production capacity to deliver on its promises. For example, the Kerrisdale Report stated, *inter alia*:

> **The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated**. Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win would be in the billion dollar range over the course of 5-10 years. Upon winning the contract, management curbed those expectations by quite a bit, though still signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue, specifically citing the National Defense Authorization Act (NDAA) text.
>
> But the NDAA says nothing about the SRR funding in particular and the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million, which is a very far cry from Red Cat's 2025 SRR guidance. Additionally, the cost for repairs, replacements, and related services are included in that $20-25 million, so Red Cat's "plus 30%" should be entirely discounted.

The Kerrisdale Report also noted that Red Cat had compromised the overall value of the SRR Contract by announcing its award of the contract without the U.S. Army's permission, stating, *inter alia*:

> We also discovered in the course of our diligence that Red Cat's November announcement of the SRR contract win was made improperly without the Army's approval. While that's unlikely to scuttle the contract win completely, our sources indicated that it might make negotiating the precise contract terms with the Army contentious and more difficult for Red Cat. It may also result in the Army more strictly enforcing contract terms and more willing to contemplate other suppliers if and when the opportunity presents itself.

Further, the Kerrisdale Report raised concerns about the timing of executive departures and insider transactions that took place shortly after the announcement of the SRR contract, stating, *inter alia*:

> **<u>Teal's wunderkind founder and brains behind the SRR, George Matus, resigned just a week after the SRR announcement, with CFO Leah Lunger resigning just 3 weeks later.</u>**
>
> * * *
>
> Six days after Red Cat announced the SRR award, Matus gave 30 days' notice of his resignation. Between December 20th and December 27th, he sold about 800,000 shares at an average price of $11.75. Just a few days after his resignation, Matus announced he was co-founding a new company dedicated to addressing weaknesses in the defense procurement ecosystem, which suggests that his resignation was a long time in coming. That seems to us like a harsh repudiation of Red Cat and its management team, and a vote of no-confidence in the ability of the company to achieve what management says it will.
>
> Matus wasn't the only one at Red Cat lacking conviction. CFO Leah Lunger announced on the mid-December earnings call that she was resigning for family reasons and sold half a million shares – about 60% of her holdings – for $9.52 on December 20th. Other directors and insiders – including CEO Jeffrey Thompson! – have sold a total of 1.6 million shares for over $16 million just since December 20th.

The Kerrisdale Report also alleged that Red Cat has continued to mislead

investors about the Salt Lake City Facility's production capacity, stating, *inter alia*:

> Over the last 3 years, Red Cat has promised investors multiple times that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . [D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones. Getting there would take time and a real capital expenditure commitment.
>
> * * *
>
> In the course of our due diligence, we found a drone industry specialist who's been following Teal since its founding by Matus and who had the utmost admiration for what he's accomplished. They were adamant that there's just no way that Teal is capable of any sort of mass production . . . . Red Cat's financials seem to confirm this assessment: Over the 3 years ending on October 31, the company has spent a mere $3.1 million on capital expenditures, with over two thirds of that before the end of 2022. It's highly implausible that a mass-production facility for manufacturing drones has been built at any point in the last two years for less than $1 million.

Following publication of the Kerrisdale Report, Red Cat's stock price fell $2.35 per share, or 21.54%, over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

## **INSIDER TRADING**

The Officers and Directors were further motivated to engage in the fraudulent course of conduct in order to enable Company insiders to collectively sell over a million dollars' worth of their personally held Red Cat common stock while in possession of the material, non-public information described herein.

Specifically, (i) you enriched yourself by over $5.7 million by selling 500,000 shares of Red Cat common stock; (ii) Lunger enriched herself by approximately $5 million by selling 524,798 shares of Red Cat common stock; (iii) Matus enriched himself by approximately $9.2 million by selling 781,383 shares of Red Cat common stock; and (iv) Hitchcock enriched himself by approximately $1.2 million by selling 113,823 shares of Red Cat common stock.

## ACTION DEMANDED

By virtue of their positions as directors and/or officers of the Company and because of their ability and duty to control the business and corporate affairs of the Company, the above-named Officers and Directors of Red Cat owe the Company and its shareholders the fiduciary duties of loyalty, due care, and candor.

As noted above, on behalf of Ms. Henderson, we demand that full corrective action be brought, including commencing a civil action against each responsible individual and entity and each responsible affiliate of the Company, including each of the above-named Officers and Directors, to recover for the benefit of the Company, as described at the outset of this letter. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result of their breaches of fiduciary duties and other wrongful conduct as described herein.

The action that should be brought against the above-mentioned individuals should seek a monetary recovery for damages that include, but are not limited to:

(a) Damage to the Company's reputation and good will (including irreparable damage to the Company's reputation and credibility);

(b) Resultant loss of business and business opportunities;

(c) Increased costs of capital;

(d) Legal fees, costs, and potentially substantial amounts payable in settlement or satisfaction of the factually related securities class action,

captioned: *Olsen v. Red Cat Holdings, Inc, et al.*, Case No. 2:25-cv-05427 (D.N.J.), and other lawsuits; and

(e) Recoupment of all illicit proceeds and unjust enrichment from the above-described insider trading and breaches of fiduciary duty.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon the Company as a result of the conduct described herein no later than ten (10) business days from receipt of this letter. If you have any questions, please do not hesitate to contact the undersigned counsel. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*
Gregory M. Egleston

cc: Thomas J. McKenna, Esq.
Christopher M. Brain, Esq.

ORIGIN ID:JRAA (212) 983-1300
THOMAS J. MCKENNA
GAINEY MCKENNA & EGLESTON
260 MADISON AVENUE
22ND FLOOR
NEW YORK, NY 10016
UNITED STATES US

SHIP DATE: 11JUL25
ACTWGT: 1.00 LB
CAD: 8014243/INET4535

BILL SENDER

TO **MR. JEFFREY M. THOMPSON**
**C/O VCORP SERVICES, LLC**
**701 S. CARSON ST.**
**SUITE 200**
**CARSON CITY NV 89701**
(888) 528-2677 REF: 100.1914
INV:
PO: DEPT:

58GJ5/99C7/59F2

FedEx Express

E

J253025062301uv

**WED - 16 JUL 5:00P**
**EXPRESS SAVER**

TRK# 0201 **8827 1988 8834**

**CSNA 89701**

**SX RENOG**

**NV-US RNO**

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT B

SheppardMullin

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

310.228.3746 direct
rweber@sheppardmullin.com

September 9, 2025

**VIA E-MAIL**

Christopher M. Brain, Esq.
Gainey McKenna & Egleston
260 Madison Ave., 22nd Floor,
New York, NY 10016
Email: cbrain@gme-law.com

Re: Red Cat Holdings, Inc. / Demand for Board Action

Dear Mr. Brain:

This letter is in response to your email to me dated August 19, 2025, which enclosed a June 17, 2025 letter from your colleague Gregory Egleston addressed to Jeff Thompson of Red Cat Holdings Inc. ("Red Cat"), demanding certain board action (the "Demand Letter").

As you apparently are aware, I have been retained to represent a number of current or former officers and directors of Red Cat in connection with a securities class action filed earlier this year in USDC District of New Jersey, styled as *Olsen v. Red Cat Holdings, Inc, et al.*, D.N.J. Case No. 2:25-cv-05427 (the "Class Action"). That lawsuit is referenced within Mr. Egelston's Demand Letter.

In addition to that representation, Sheppard Mullin is currently in the process of being retained to represent all defendants except for George Matus in connection with a putative shareholder derivative action filed on August 11, 2025 by the Brown Law Firm, styled *as Fuchs, derivatively on behalf of Red Cat Holdings, Inc. v. Thompson, et al.*, USDC for the District of Nevada Case No. 2:25-cv-1473 (the "Nevada Derivative Action"). Most of the defendants named in the Nevada Derivative Action are subjects of Mr. Egleston's Demand Letter.

The Demand Letter demands that the Red Cat Board of Directors (the "Board") investigate and, if appropriate, commence legal proceedings for breaches of fiduciary duties against persons who allegedly engaged in wrongdoing that harmed Red Cat. The alleged wrongdoing noted in the Demand Letter appears to be the very same conduct that is the subject of both the Class Action and Nevada Derivative Action; to wit, allowing persons to make allegedly misleading statements about Red Cat's production capacity and potential value of a U.S. Army contract for which the company was competing.

Red Cat and the defendants that we represent in the Class Action will vigorously defend against the Class Action, and intend to file a motion to dismiss in relatively short order.

SheppardMullin



There exists significant overlap between the issues described in the Demand Letter and issues that are central to the Class Action and Nevada Derivative Action, the resolution of which likely will impact the merit, costs and benefits of pursuing additional investigation or litigation. The contingent nature of the alleged damage asserted in the Demand Letter is further support that a response to the Demand Letter is premature for now. Developments in the litigation will be informative as to the merits and value of any potential claims related to the Demand Letter.

Accordingly, the Board believes that for the moment it is premature to undertake additional investigation and/or pursuit of claims as demanded in the Demand Letter. The Board expects to revisit this matter in ninety days to determine how to best address the issues raised in the Demand Letter, at which point I may revert to you with further information.

If you wish to discuss this matter sooner, please do not hesitate to contact me at (310) 663-7622. I recognize that all parties reserve all rights.

Very truly yours,

Robert D. Weber
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4934-7637-7447.1